IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 22, 2006 Session

## JERRY ALAN TAYLOR, by and through his next friend, KAY TAYLOR GNEIWEK v. JACKSON-MADISON COUNTY GENERAL HOSPITAL DISTRICT, ET AL.

Direct Appeal from the Circuit Court for Madison County
No. C98-268    Donald H. Allen, Judge

No. W2005-02471-COA-R3-CV - Filed August 23, 2006

Defendant Jackson-Madison County General Hospital District ("Defendant") appeals a judgment awarding damage for malpractice to Plaintiff Kay Gneiwek ("Plaintiff") as administrator of the estate of Jerry Alan Taylor. Defendant raises issues pertaining to the competency of Plaintiff's expert witness, Dr. Douglas Harkrider, M.D., to provide testimony in this case, and further argues that Dr. Harkrider's testimony failed to establish proximate causation as required under Section 29-26-115 of the Tennessee Code. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Jerry D. Kizer, Jr. And Patrick W. Rogers, Jackson, Tennessee, for the appellant, Jackson-Madison County General Hospital District.

David Wayne Camp, Jackson, Tennessee, for the appellee, Kay Taylor Gneiwek

**OPINION**

*Factual Background and Procedural History*

On September 6, 1997, Jerry Taylor ("Mr. Taylor") went to the Jackson-Madison County General Hospital ("Defendant") Emergency Room with a fever of unknown origin. Mr. Taylor was subsequently admitted to the hospital and received various medical treatments and diagnostic procedures. The next day, Mr. Taylor was administered the drug Unasyn through his intravenous catheter. Mr. Taylor's medical chart did not list any known allergies and, when asked about known allergies by Karen Forrest ("Nurse Forrest"), the nurse on duty, Mr. Taylor

responded that he had none. Shortly after receiving the Unasyn, Mr. Taylor began having an allergic reaction and notified nurses employed by Defendant. Upon reaching Mr. Taylor's room, Nurse Forrest noted that Mr. Taylor appeared flushed and was having difficulty breathing. Nurse Forrest stopped the Unasyn drip, believing that Mr. Taylor might be having an allergic reaction. Medical personnel were summoned, and Mr. Taylor was administered epinephrin, CPR, and was intubated. Mr. Taylor was revived, but suffered irreparable brain damage. Mr. Taylor subsequently transferred to and remained a resident of a long-term care facility until his death on September 17, 2005.

Kay Taylor Gniewick ("Plaintiff")[1] filed suit on Mr. Taylor's behalf on August 27, 1998, against Defendant as well as Dr. Michael Houchin, the University of Tennessee Family Practice Center, University of Tennessee Memphis Health Science Center, and Dr. Kevin Gray. On September 1, 1998, Plaintiff filed an Amendment of Complaint, amending the original Complaint by adding West Tennessee Healthcare, Inc., as an additional defendant. On June 25, 2001, a consent order was entered dismissing the University of Tennessee Family Practice Center, the University of Tennessee Health Science Center, and Dr. Michael B. Houchin. On October 4, 2001, the trial court entered a consent order granting summary judgment in favor of Dr. Kevin Gray. On July 18, 2003, the trial court entered an Order Granting Defendant West Tennessee Healthcare, Inc.'s Motion for Summary Judgment. Plaintiff subsequently filed a Second Amended Complaint asserting liability against Defendant via *respondeat superior* for the actions of Dr. Michael Houchin.

Trial was held on November 16, 2004. At trial, Plaintiff presented the deposition testimony of Dr. Douglas Harkrider, an emergency room physician practicing in Atlanta and Gainesville, Georgia.[2] In his deposition, Dr. Harkrider testified that the nurses and respiratory therapists employed by Defendant were negligent and that Mr. Taylor suffered hypoxic encephalopathy as the result of too little oxygen in his system for a significant period of time during the CPR. Defendant objected to Dr. Harkrider's testimony on the grounds that he was not competent to testify because he did not establish that he knew the applicable recognized standard of acceptable professional practice in Jackson, Tennessee, or of a similar community, and that his opinions were based on a "national standard of care." Defendant also objected to Dr. Harkrider's deposition testimony because Defendant argued that Dr. Harkrider could not testify to a reasonable degree of medical certainty that any negligent actions of the Defendant caused Mr. Taylor's injuries. Since Defendant asserted that Dr. Harkrider was incompetent to testify and further argued that Dr. Harkrider's testimony failed to establish causation, it moved to dismiss Plaintiff's case. The trial court took Defendant's objection and motion under advisement, but admitted the deposition testimony.

---

[1] Suit in this matter was initially instigated by Ms. Gneiwek as "Kay Gneiwek as next friend of Jerry Alan Taylor." However, after Mr. Taylor's death, this Court entered an order substituting "Kay Gneiwek as the administrator of the estate of Jerry Alan Taylor" for "Kay Gneiwek as next friend of Jerry Alan Taylor."

[2] At trial, Plaintiff presented no live witness testimony. Rather, Plaintiff submitted proof in the form of deposition testimony and other exhibits.

On August 3, 2005, the trial court issued a letter ruling in Plaintiff's favor and specifically finding that Dr. Harkrider's testimony satisfied the requirements of Tenn. Code Ann. § 29-26-115(a), thus making him competent to give expert testimony. The trial court also found Defendant liable for the injuries suffered by Mr. Taylor and awarded damages in the amount of $1,400,000.00 plus all court costs. Judgment was entered on the trial court's findings on September 15, 2003, and Plaintiff's award was reduced to $130,000.[3] The trial court also entered a final order denying Defendant's motion to dismiss which was raised at the November 16, 2004 hearing. Defendant appeals.

## *Issues Presented*

Defendant presents the following issues for review: (1) whether the trial court erred in holding that Plaintiff's only expert, Dr. Douglas Harkrider, was competent to testify; and (2) whether the trial court erred in holding that Plaintiff proved by a preponderance of the evidence through her only expert, Dr. Douglas Harkrider, that Defendant caused harm to Jerry Taylor that would not otherwise have occurred but for the alleged negligence.

## *Analysis*

### Expert Competency

The Defendant asserts that the trial court erred in finding that Plaintiff's expert, Dr. Harkrider, was competent to testify in this matter. Specifically, Defendant asserts that Dr. Harkrider lacked sufficient knowledge of the standards of acceptable professional medical practice Jackson, Tennessee, to satisfy Tennessee's locality rule. Defendant also asserts that Dr. Harkrider erroneously based his opinions upon a national standard of care rather than a local standard of care. For the reasons set forth below, we affirm the trial court's determination that Dr. Harkrider was competent to give expert testimony in this matter.

Before addressing Defendant's issues, we first note the applicable standard of review. Trial courts in Tennessee are vested with broad discretion in determining the admissibility, qualifications, and competency of expert testimony. *Roberts v. Bicknell*, 73 S.W.3d 106, 113 (Tenn. Ct. App. 2001) (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)). However, "[a]lthough the trial court has broad discretion in determining the qualifications of expert witnesses and the admissibility of their testimony . . . [,] reversal of the trial court's discretion is appropriate where the trial court's action is clearly erroneous or where there has been an abuse of discretion." *Wilson v. Patterson*, 73 S.W.3d 95, 102 (Tenn. Ct. App. 2001) (citations omitted).

---

[3]Recovery was limited under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq.*

Section 29-26-115 of the Tennessee Code sets forth a plaintiff's burden in a medical malpractice case, and provides as follows:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
>
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. . . .
> . . . .

Tenn. Code Ann. § 29-26-115 (Supp. 2005).

Proof regarding the "failure of a physician to adhere to an acceptable standard of care in treating a patient must be by expert medical testimony." *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006); *Roberts*, 73 S.W.3d at 113. "In order to qualify as an expert in a medical malpractice action, a physician is not required to be familiar with all the medical statistics of a particular community." *Wilson*, 73 S.W.3d at 102. (citing *Ledford v. Moskowitz*, 742 S.W.2d 645 (Tenn. Ct. App. 1987)). However, in order to satisfy the requirements set forth under Section 29-26-115(a),

> a medical expert relied upon by the plaintiff "must have knowledge of the standard of professional care in the defendant's applicable community or knowledge of the standard of professional care in a community *that is shown to be similar* to the defendant's community." *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002). Expert witnesses may not simply assert their familiarity with the standard of professional care in the defendant's community without indicating the basis for their familiarity. *Id.*; *see also Stovall v. Clarke*, 113 S.W.3d 715, 723 (Tenn. 2003); [*Kenyon v. Handal*, 122 S.W.3d 743, 760, 762 (Tenn. Ct. App. 2003)].

*Williams*, 193 S.W.3d at 553. "[W]hile an expert's discussion of a national standard of care does not require exclusion of the testimony, 'such evidence may not substitute for evidence that

first establishes the requirements of [Section] 29-26-115(a)(1).'" *Stovall*, 113 S.W.3d at 722 (quoting *Robinson*, 83 S.W.3d at 724). Thus, if a plaintiff's expert fails to demonstrate adequate knowledge concerning the medical resources and standards of care of the community in which the defendant practices, or a similar community, then such plaintiff will be unable to demonstrate a breach of duty. *Mabon v. Jackson-Madison County Gen. Hosp.*, 968 S.W.2d 826, 831 (Tenn. Ct. App. 1997) (citing *Cardwell v. Bechtol*, 724 S.W.2d 739, 754 (Tenn. 1987)).

In arguing that Dr. Harkrider's testimony failed to satisfy Tennessee's locality rule, Defendant argues that Dr. Harkrider failed to provide a sufficient basis for comparing the medical community of Jackson, Tennessee, to that of Gainesville, Georgia, where Dr. Harkrider practiced. Specifically, Defendant asserts that Dr. Harkrider made mere conclusory statements regarding the similarity of the two communities while, at the same time, demonstrating a complete lack of knowledge with the Jackson, Tennessee, community. In essence, Defendant argues that Dr. Harkrider's testimony is analogous to medical expert testimony previously addressed by this Court in *Mabon v. Jackson-Madison County General Hospital*, 968 S.W.2d 826 (Tenn. Ct. App. 1997).

In *Mabon*, this Court excluded medical expert testimony offered by the plaintiff because the proffered expert could not establish that he had any familiarity with the medical community in Jackson, Tennessee, or a similar community. *Id.* at 831. In so holding, this Court specifically noted the following portion of the proffered expert's deposition testimony:

Q:     What's the population, Dr. Shane, of Jackson, Tennessee?

A:     I don't know exactly.

Q:     How many hospitals are there in Jackson?

A:     I don't know.

Q:     Do you know if there are any colleges or universities there?

A:     No, I don't.

Q:     Do you know if there are any medical schools there?

A:     Not for sure.

Q:     Do you know how many doctors there are in Jackson?

A:     No.

Q:     Do you know what medical specialties are represented in Jackson?

A:      No, I don't.

Q:      Have you ever been to Jackson?

A:      No.

Q:      Do you know any doctors that practice in Jackson?

A:      No.

Q:      Have you ever treated any patients from Jackson?

A:      Not that I'm aware of.

Q:      Do accepted standards, that is the standard of care, do they change over time?

A:      Yes, they can.

Q:      Is the practice of medicine an exact science?

A:      No.

Q:      You can't completely practice medicine by what's called the cookbook method, can you?

A:      No, you can't.

Q:      You've not reviewed any medical records from Jackson except in this case, right?

A:      I don't think so that I can recall.

*Id.* at 830-31. In support of its argument that Dr. Harkrider's testimony is analogous to that in *Mabon* and should thus be excluded, Defendant, in its brief, quoted the following portion of Dr. Harkrider's deposition testimony:

Q.      Now, at the time that we took your deposition back [in] March of 2002, you told me you knew nothing about Jackson, Tennessee; is that correct?

A.      I don't think I've driven through it. I've not visited.

Q.      Well, did you tell me that you knew nothing about Jackson, Tennessee?

-6-

A.     At the time?

Q.     Yes

A.     That I can recall, no.

Q.     That is correct, that you–that's what you told me?

A.     That's correct.

Q.     Have you ever been to Jackson?

A.     I think I just said I'm not sure that I have.

Q.     Okay.  Do you know where it's located?

A.     60, 70 miles outside of Memphis, I believe.

Q.     Which direction?

A.     I don't know, to the west?  Don't know.

Q.     Okay.  What's the population?

A.     Don't know.

Q.     Okay.  How many hospitals in Jackson?

A.     Don't know specifically.

Q.     Do you know anybody that lives in Jackson other than Mr. Camp?

A.     No, sir.

Q.     Do you know of anyone that's ever practiced medicine or practiced nursing or respiratory therapy in Jackson, Tennessee?

A.     Know them personally?

Q.     Know anybody, yeah.

A.     No, sir

Q.    Are you familiar with the skills of nurses and respiratory therapists in Jackson, Tennessee?

. . . .

A.    I would have to answer that question that I would–I would–I would expect the skills of the nursing staff at–in Jackson to be comparable to the nursing skills that I would see here at Dunwoody Medical Center, at Northeast Georgia Medical Center.

Q.    But you don't know that's the case.  You just expect that?

A.    I would expect any physician would expect that.

Q.    Okay.  Have you ever practiced in Tennessee?

A.    No, sir.

Q.    Have you ever treated a patient from Jackson, Tennessee?

A.    I'm absolutely positive that I have in my 25 years.  We see a significant number of transients that come through here at this hospital and also at Northeast Georgia, but to mention a specific name, no, sir, I could not.

Q.    How many colleges and universities are in Jackson, Tennessee?

A.    I don't know.

Q.    How many medical schools in Jackson in 1997?

A.    Don't know.

Q.    Were there any teaching hospitals in Jackson in 1997?

A.    Don't know.  I believe Jackson-Madison County Hospital is a teaching hospital.

Q.    Have you ever reviewed any - - any medical records in any other case from Jackson, Tennessee other than this–this case?

A.    Well, I think we answered that when we did the deposition, that I've - - I've reviewed in my 25 years, 10 or 15 cases, and several have been from Tennessee, but as to whether they were from Jackson, I can't recall.

-8-

Despite the initial similarity between Dr. Harkrider's testimony and that provided by the expert in *Mabon*, we find the facts of *Mabon* distinguishable from the facts presented in this case. Although, like the expert in *Mabon*, Dr. Harkrider's testimony during examination by Defendant's counsel appeared to establish that Dr. Harkrider lacked knowledge about the Jackson community, our review of the record shows that, unlike the proffered expert in *Mabon*, Dr. Harkrider later rehabilitated himself under questioning by counsel for Plaintiff. Specifically, Dr. Harkrider testified that he had conducted research concerning the community of Jackson, Tennessee, including referencing information concerning physicians and medical specialties in Jackson from a 1997 edition of the "Yellow Pages" directory for Jackson Tennessee; reviewing information from the Madison County Chamber of Commerce regarding the community of Jackson, Tennessee; and reviewing information about the Defendant Jackson-Madison County General Hospital.

In relation to his review of information and materials concerning Jackson, Tennessee, Dr. Harkrider, subsequent to questioning by Defendant's counsel, testified as follows:

Q.     [by Plaintiff's counsel] Looking with me at Exhibit 3 specifically, Dr. Harkrider, you indicated you had previously reviewed this prior to your deposition here today; is that correct?

A.     Yes.

Q.     And this is involving the community or rather the Madison County Chamber of Commerce?

A.     Yes.

Q.     I want to turn if I could please, sir, to community data, and if you would look with me under location, do you see an indication in there as to precisely where Jackson is located?

A.     It looks like it's 79 miles from Memphis and 126 miles from Nashville.

. . . .

Q.     (By Mr. Camp) Doctor, in relation to the community data sheet, can you look at that very briefly, and I'm going to ask you a few questions about that.

A.     Open this page here?

Q.     Yes sir, I think on the flip side too there's information on the back as well. I believe it's categorized. Do you see anything in there that references population?

A.    I think that's on the first page actually.  The population in 1980 was 49,000, county is 75,000; 1990, 48,000, 77,000; and 2000, 59,000 and 91,000.

Q.    Also Doctor, I believe there's another provision on the page if you could flip it over again maybe involving health.

MR. KIZER: Object to the form of the question, its clearly leading.

MR. CAMP: I didn't mean to cut you off, Jerry.  Go ahead.

MR. KIZER: It's clearly leading.  He's already testified he didn't know these things.

MS. TUTTLE: Same objection.

Q.    (By Mr. Camp) Doctor, do you see anything on that document which you previously identified by testimony that you had reviewed related to health?

A. To health?

Q. Hospitals, things of that nature?

A. Oh.

MR. KIZER: Can we have a continuing objection to this line of questioning so I don't continually interrupt you?

MS. TUTTLE: I join in.

MR. KIZER: Thank you.

MR. CAMP: No problem.

THE WITNESS: Healthcare, hospitals, Jackson-Madison County Hospital, and hospitals, Methodist LeBonheur.

Q.    (By Mr. Camp). Okay.  Does it reflect anything else [sic] either two of those facilities?

A.    300-plus doctors, 74-plus dentists, 11 nursing.

Q.    Doctor, is there also something in there referencing anything regarding schools?

-10-

A.    Daycare, educations, is state industrial training site available, yes; elementary schools, 14, middle, six, seniors, three, colleges or universities, five.

Q.    Okay.

A.    It looks basically like Hall County, Georgia[,] where I practice at Northeast Georgia Medical Center.

Q.    All right.  If I might have that back, Doctor.  Doctor, do you have any information or any reason to believe that Jackson has somehow moved or relocated or is in a different location than it was in 1997?

A.    No.

Q.    Doctor, do you feel then that you still have sufficient knowledge regarding the locale of Jackson-Madison County, Tennessee[,] and/or Jackson-Madison County General Hospital so as to offer the opinions that you've previously offered here today relating to standard of care, deviation from standard of care, and those other aspects of your testimony?

MR. KIZER:  Object - - object to the leading form of the question and its repetitive.

MS. TUTTLE: Same objection.

THE WITNESS: Yes

In addition, the record further shows that Dr. Harkrider testified that he had been licensed to practice medicine in Georgia since 1977 and had practiced emergency medicine for twenty-five years.  Dr. Harkrider also testified that he practiced medicine at Dunwoody Medical Center in Atlanta Georgia as well as at the Northeast Georgia Medical Center in Gainesville, Georgia.  Furthermore, Dr. Harkrider also compared the Defendant Hospital with Northeast Georgia Medical Center, based in Gainesville, Georgia, where Dr. Harkrider practiced, and testified as follows:

Q.    (By Mr. Camp) Doctor, what - - you've mentioned previously that you worked at Northeast Georgia Medical?

A.    Yes, sir.

Q.    What type of hospital is Northeast Georgia Medical?

A.    It's a full service hospital based in Gainesville, Georgia, which is approximately 40 miles north east of Georgia - - of Atlanta.  It's a tertiary

facility. Has all subspecialties, areas of medicine. It has a 20-county catchment area of patients that are referred to it.

Q. Okay. And have you made any comparisons with the work or practice that you have at the Northeast Georgia Medical facility to Jackson-Madison County General Hospital?

A. I have.

Q. And what were the comparisons that you made?

A. The hospitals look fairly similar. They both are referral hospitals. They both have large catchment areas. They both have very busy emergency departments. I think Jackson-Madison County has somewhere around a hundred thousand, a hundred and five thousand. Northeast Georgia is between 75 and 80,000. I see all types of patients, and that would be the similarity.

Q. What area in or what department did you primarily work at at Northeast Georgia Medical?

A. In the emergency department.

Q. And did you work at this facility in 1997?

A. I did.

Q. Okay. Doctor, based upon your review of the documents that have been previously marked and your own independent research, review of the Jackson-Madison County community as well as your own work experience at Northeast Georgia Medical, do you believe you have sufficient knowledge of the community of Jackson-Madison County so as to be familiar with the recognized standard of acceptable professional practice of medicine as it relates to emergency intervention and emergency medicine and proper administration of cardiopulmonary resuscitation?

A. I have.

As previously noted, trial courts have broad discretion in determining expert witness competency and qualifications, and this Court will not reverse the trial court's actions unless there has been an abuse of discretion. *Wilson*, 73 S.W.3d at 102. Furthermore, as held by this Court in *Roberts v. Bicknell*, 73 S.W.3d 106, 114 (Tenn. Ct. App. 2001),

The law on expert witnesses, as it exists in Tennessee, requires the expert to have some knowledge of the practice of medicine in the community at issue or in a similar community. We believe that it is reasonable to base such knowledge, among other things, upon information such as the size of the community, the existence or non-existence of teaching hospitals in the community and the location of the community. Without such information, it is difficult to compare communities for the purpose of satisfying the locality rule.

Based upon the record above, we find that the trial court did not abuse its discretion in ruling that Dr. Harkrider satisfied the locality rule. Specifically, we find that Dr. Harkrider possessed adequate knowledge of the standard of professional care in a community sufficiently shown to be similar to that of Jackson, Tennessee. Dr. Harkrider established that he was sufficiently familiar with the local standards of medical practice in 1997 at the Northeast Georgia Medical Center located in Hall County, Georgia. Furthermore, we find that Harkrider adequately established that the community surrounding the Northeast Georgia Medical Center was similar enough to that of Jackson, Tennessee, to satisfy the locality rule.

Having determined that Dr. Harkrider satisfied the locality rule, we next address Defendant's argument that Dr. Harkrider's testimony was based upon a national standard of care rather than the standard of care in Jackson, Tennessee, or a similar community. In *Robinson v. LeCorps*, 83 S.W.3d 718 (Tenn. 2002), the Tennessee Supreme Court refused to broaden Tennessee's locality rule, set forth at section 29-26-115(a)(1) of the Tennessee Code, "by adopting a national standard of professional care for all malpractice actions. . . ." *Id.* at 723. Rather, the court held as follows:

> [W]e believe that the legislative intent and purpose of Tenn. Code Ann. § 29-26-115(a)(1), as presently derived from the statutory language, continues to be that the conduct of doctors in this State is assessed in accordance with the standard of professional care in the community in which they practice or one similar to it.

*Id.* at 724. However, in discussing the effect of an expert's reference to a national standard of care, the court further noted that "[w]hile an expert's discussion of the applicability of a national standard does not require exclusion of the testimony, such evidence may not substitute for evidence that first establishes the requirements of Tenn. Code Ann. § 29-26-115(a)(1)." *Id.* at 724. *See also Stovall v. Clarke*, 113 S.W.3d 715, 722 (Tenn. 2003).

In the case at bar, Defendant cites to the following testimony by Dr. Harkrider in support of its assertion that Dr. Harkrider relied upon a national standard of care:

Q.      Okay. You also told me in your deposition that you know that the standard of care for these nurses and other personnel and Dr. Houchin because it's a national standard of care; did you not?

A.      Yes, sir.  But I also based - -

Q.      Wait just a minute.  I just need a yes or no answer.

A.      Yes, sir.

Q.      On page 62, I ask you: Do you contend that you know the standard of care for emergency room physicians in Jackson, Tennessee.  And your answer was: I would say that the practice of emergency medicine throughout the United States has a certain standard of care that needs to be met or is met and is expected throughout all towns and communities in the United States.
        My question on line 16: So that's the reason that you know the standard in Jackson, Tennessee[,] because it's a national standard.  Answer: Yes sir.
        Do you agree with that?

A.      Yes, sir.

Q.      Okay.  And then I ask you about the standard of care for nurses, and you also testified that you knew the standard of care for nursing personnel in Jackson, Tennessee[,] because it was a national standard; isn't that right?

A.      And you're looking on line?

Q.      Page 63.

A.      Okay.

Q.      Line 3: Do you contend that you know the standard of care for nursing personnel in Jackson, Tennessee, and then you gave a rather long answer, and then on line 19: You think there's a national standard of care for nurses.  Answer: Yes, sir.  Question on line 22: As well as physicians.  Answer: Yes, sir.  Line 24: So that would be the reason that you would know the standard of care for nurses in Jackson, Tennessee; is that correct.  Answer: Yes, sir.

A.      I'll agree with that.

Q.      Okay. Now - -

A.      Can I - - can I expound on my answer?

Q.      Well, you can if your attorney wants to follow-up on it.

-14-

A.      Okay.

Q.      And then on page 65 you said, I asked you: How can you say there's a
        national standard for RNs on page - - on line5?

A.      Okay.

Q.      Do you see that?

A.      Uh-huh.

Q.      And your answer was: Based on my experience and what I would expect if
        I picked up and practiced in Tennessee, what I would expect from the nursing
        service or if I practiced in Seattle or in Houston, Texas. Question: Or in New
        York City. Answer: Or in New York City. Question: Or San Francisco,
        California. Answer: Yes, sir.

A.      I would agree with that.

Although Dr. Harkrider testified to a national standard of care, it appears from the record
that he did in fact rely upon a local standard of care in testifying regarding the duty of care owed
to Mr. Taylor in this case, and whether such standard of care was breached. Specifically, earlier
in his deposition, Dr. Harkrider testified as follows:

Q.      Okay. Doctor, based upon your review of the documents that have been
        previously marked and your own independent research, review of the
        Jackson-Madison County community as well as your own work experience
        at Northeast Georgia Medical, do you believe that you have sufficient
        knowledge of the community of Jackson-Madison County so as to be
        familiar with the recognized standard of acceptable professional practice
        of medicine as it relates to emergency intervention and emergency
        medicine and proper administration of cardiopulmonary resuscitation?

A.      I have.

. . . .

A.      I think that I can make a comparison between the two hospitals, and they
        look very similar in size, scope, types of patients that they see, type of
        treatments that they do, and I think the standard of care would be similar
        between the two hospitals.

. . . .

-15-

Q.     (By Mr. Camp) Dr. Harkrider, are you familiar with the recognized standard of acceptable professional practice in the profession of medicine and in the specialty of emergency medicine that the defendants, Dr. Michael Houchin and Jackson–and the employees of Jackson-Madison County General Hospital would have practiced in the Jackson-Madison County community or in similar communities at the time [Mr. Taylor] was injured in 1997?

A.     I am.

. . . .

Q.     . . . . Dr. Harkrider, would you be familiar with the recognized standard of acceptable professional practice in the profession of medicine and the specialty of emergency medicine as it pertains to respiratory therapists, registered nurses, and other hospital personnel relating to the administration of cardiopulmonary resuscitation in the Jackson-Madison County community or in similar communities at the time the plaintiff was injured in 1997?

A.     I would.

Later in his deposition, Dr. Harkrider again stated his familiarity with the proper standard of local care, in conjunction with discussing his belief in a national standard, and testified as follows:

Q.     [by opposing counsel] And when your deposition was taken in March with regard to Dr. Houchin, you testified that your knowledge of the applicable standard of care in 1997 that Dr. Houchin would have been required to confirm to was based upon your knowledge of a national standard of care applicable to emergency medicine physicians; isn't that correct?

A.     That's correct.

Q.     And in fact, Dr. Houchin was not a board certified emergency physician in 1997?

A.     Let me amend that. My opinion came from not only my experience of being an emergency room physician and being the director of an emergency department reviewing cases, but also my experience of being the director of a small immediate care facility, actually three of them for the hospital, which is more of a family practice-type - - type situation, where I would treat patients myself as well as review and set policies and procedures for those facilities. So my opinion came from my experience of both these situations.

-16-

Q. Okay. So your opinion of the applicable standard of care that would have pertained to Dr. Houchin, a third year family practice resident, was based upon your experiences that you have had here in Georgia; correct?

A. Here in Georgia working in the hospital, at several hospitals in the area, working multiple codes in these hospitals in like and similar circumstances.

. . . .

Q. [by Plaintiff's counsel] Doctor, do you feel then that you still have sufficient knowledge regarding the locale of Jackson-Madison County, Tennessee[,] and/or Jackson-Madison County General Hospital so as to offer the opinions that you've previously offered here today relating to standard of care, deviation from standard of care, and those other aspects of your testimony?

. . . .

THE WITNESS: Yes.

Furthermore, as previously noted, Dr. Harkrider testified that he had reviewed information about the Jackson, Tennessee, community, including information about the type of medical care available in the Jackson community, and further testified that Jackson Tennessee, and the Jackson-Madison County Hospital, were similar to the locality and medical center at which he practiced in Northeast Georgia. Based upon the foregoing, we find that the trial court did not abuse it discretion in finding that Dr. Harkrider properly based his testimony on the local standard of medical care in a community sufficiently similar to that of Jackson, Tennessee, and not on that of a national standard.

### *Burden of Proof on Issue of Causation*

The Defendant also asserts that the trial court erred in finding that Plaintiff met the requisite burden of proof on the issue of causation. Specifically, Defendant argues that Plaintiff's expert, Dr. Harkrider, failed to establish to a reasonable degree of medical certainty that the alleged negligent conduct of Defendant's employees caused the injuries suffered by Mr. Taylor. For the reasons set forth below, we agree with Defendant.

Our standard of review of a trial court sitting without a jury is *de novo* upon the record. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of evidence is otherwise. Tenn. R. App. P. 13(d)(2005). However, no presumption of correctness attaches to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

As previously discussed in this opinion, in order to succeed in a malpractice action, a plaintiff must prove:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary or reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not have otherwise occurred.

Tenn. Code Ann. § 29-26-115 (Supp. 2005); *see also Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990). In order to establish causation, a

> plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough. . . . [Citation omitted]. . . . Thus, proof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a *reasonable degree of medical certainty*.

*Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993) (citations omitted) (emphasis added).

In the case at bar, Plaintiff's expert witness, Dr. Harkrider, testified that Defendant's employees deviated from the recognized standard of medical care in treating Mr. Taylor. In addressing causation, Dr. Harkrider testified as follows:

> Q. All right. Doctor, as it relates to the conduct, acts, and/or omissions of the specific employees of the hospital previously identified, . . . do you have an opinion, sir, as to whether the–whether those conduct–whether that conduct, those acts, or omissions more likely than not caused [Mr. Taylor's] injury in this matter?
>
> A. I do.
>
> Q. And what would be the opinion as it relates to that?
>
> . . . .

A.     My opinion is that he was hypoxic or did not have enough oxygen in his system for a significant period of time during the cardiopulmonary resuscitation, and this caused his hypoxic encephalopathy.

Q.     Okay. And upon what are you basing that opinion?

A.     The time line - - the time line of how long it took to get him intubated, the time line as to how long it took to get Epinephrin on board. I don't - - I can't guarantee that the offending agent was–was removed from his system.

Q.     Okay. And ultimately, this combination of things you testified to, what would have resulted in happening as it relates to the cardiopulmonary resuscitation?

A.     . . . . In this case, the patient in my opinion did not receive adequate oxygenation for at least the first part of the code and at least until 5:12 [p.m.] when they say he was intubated. But I don't know from the documentation whether that - - this tube was ever in the correct place or not.

Q.     Is the opinion that you've offered us here today offered to a reasonable degree of medical certainty?

A.     Yes.[4]

Although Dr. Harkrider initially testified to a reasonable degree of medical certainty that the conduct, acts, and/or omissions of the Defendant's employees caused Mr. Taylor's injuries, we find, upon a closer examination of Dr. Harkrider's deposition, that Dr. Harkrider ultimately failed to establish causation to a reasonable degree of medical certainty that any of these alleged breaches of duty actually caused the subsequent harm to Mr. Taylor. Specifically, on cross examination, Dr. Harkrider failed to sufficiently link the alleged negligent acts by Defendant's employees to the injuries suffered by Mr. Taylor to meet the required burden of proof.

In relation to whether or not the Unasyn was turned off, Dr. Harkrider appeared unable to affirmatively establish whether Defendant's employees breached a duty of care in turning the

[4]Throughout his deposition, Dr. Harkrider was also critical of Defendant's employees' actions regarding the use of a CO2 detector and pulse oximeter as well as the use of adequate fluid replacement to Mr. Taylor during the resuscitation. However, as noted in the quoted testimony above, it appears that Dr. Harkrider found the actions regarding intubation, administration of Epinephrin, and removal of the Unasyn as being the chief contributing factors to Mr. Taylor's injury. After reviewing Dr. Harkrider's testimony, we found no direct testimony stating to a reasonable degree of medical certainty whether the alleged misuse or non-use of a CO2 detector, pulse oximeter, or fluids would have made a difference in Mr. Taylor's final outcome in this case.

Unasyn off and, if the Unasyn was left on, this contributed to Mr. Taylor's injury.[5]  However, Dr. Harkrider did testify as follows:

> Q.   What would be the significance of failing to stop that Unasyn drip?
>
> A.   You'd not be able to resuscitate the patient at all.
>
> . . . .
>
> Q.   Okay.  Now, you would agree would you not that the Unasyn was turned off in this case?
>
> A.   My gut reaction is that at some point the Unasyn was turned off because if it had not been turned off, I don't think they could have resuscitated the patient at some point.

In relation to the intubation of Mr. Taylor, Dr. Harkrider acknowledged in his deposition that his main criticism of Mr. Taylor's care was that intubation was not performed in a timely enough manner.  However, when questioned as to whether the alleged failure to timely intubate proximately caused Mr. Taylor's injury, Dr. Harkrider testified as follows:

> Q.   Okay. Now, you can't testify to a reasonable degree of medical certainty whether the - - whether any delay in intubation would have–would have made a difference in the outcome of this case, can you?
>
> A.   I guess I need to be a little more specific than that.  It would - - it would be difficult for any - - anyone to - - to answer that question.

---

[5] In his deposition, Dr. Harkrider testified to the lack of proper documentation concerning all of the procedures performed on Mr. Taylor during his resuscitation.  Particularly, Dr. Harkrider noted the lack of documentation concerning whether the Epinephrin was turned off although he admitted reading the deposition testimony of Nurse Karen Forrest stating that she turned the Unasyn off upon discovering Mr. Taylor's reaction to it.  However, from our review, it does not appear that Dr. Harkrider could ever establish whether the Unasyn was left on during the resuscitation or that any negligent acts regarding the Unasyn during the resuscitation effort proximately caused Mr. Taylor's harm.  Instead, as noted above, Dr. Harkrider testified that he believed that the Unasyn was in fact turned off at some point.  Furthermore, in relation to the alleged failure of Defendant's employees to document all aspects of the resuscitation, Dr. Harkrider testified as follows:

> Q.   You would agree, Dr. Harkrider, that–that a failure to properly document as you have asserted in this case does not cause the patient harm?
>
> A.   No.
>
> Q.   Do you agree?
>
> A.   I agree.

-20-

Q.  Okay.  Well, you told me on page 31 - - 131 line 23, you said: I have to answer that question exactly like I did before.  Any situation where you're getting more oxygen to your brain, heart, lungs, and kidneys, is going to increase your changes of a reasonable outcome, of a good outcome.  As to what percentage, I can't tell you.

A.  That's absolutely correct

Q.  Okay. And again, the same issue on page 94 of your deposition, line 15.  You said: And I also read in the deposition that the respiratory therapist had the ability to intubate without the physician being present.
Line 18: And can you testify to a reasonable degree of medical certainty that that would have changed Mr. Taylor's outcome.  Answer: It would have put–it would have increased the oxygen saturation in the blood whereby it would have increased the oxygen saturation to the brain, the lungs, the heart, and the kidneys, and his chances of returning to normal life in my opinion would have been greater.  Question: How much greater.  Can you quantify that.  Answer: No.
Do you agree with that?

A.  I agree with that statement.

. . . .

Q.  Okay.  Do you have an opinion based upon a reasonable degree of medical certainty whether or not if Mr. Taylor had been intubated at 16:58 or 4:58 [(the time the nurse called the code)]  versus when he was intubated almost 14 minutes later at 5:12 p.m., whether or not that would have made a difference in the outcome of this case?

A.  I don't think any expert can say absolutely one way or the other.  The only way I can answer that question is that the sooner he was intubated, the sooner he got the Epinephrin, the greater his chance of resolving the issue and having a normal life.

Finally, in relation to the administration of Epinephrin, Dr. Harkrider testified that although he felt that the doses were appropriate, they where were not administered in a timely enough fashion.  Specifically, Dr. Harkrider testified that the first Epinephrin dose should have

been administered a minute sooner than Defendant's employees administered it. Dr. Harkrider further testified as follows:[6]

> Q. Okay. Now, if that [first] dosage [of Epinephrin] had been given a minute earlier or 45 seconds earlier, can you state with a reasonable degree of medical certainty whether that would have made a difference in the outcome in this case?
>
> A. No.
>
> . . . .
>
> Q. 1 milligram as a second dose is - - is adequate and appropriate?
>
> A. And appropriate, IV.

---

[6]At one point in his deposition Dr. Harkrider stated:

I realize that the nurse could not have given [Mr. Taylor] Epinephrin up here at 4:58 or at 5:00 because a doctor was not there to order it. But my opinion is that if he had received Epinephrin at 5:00, that maybe potentially one dose of Epinephrin total would have resuscitated him.
. . . .
    So at 5:00 or 16:58 [4:58] when Mr. Taylor started exhibiting obvious signs of shortness of breath, shallow breathing, if - - if Nurse Forrest had called the code earlier and an ACLS certified nurse had administered Epinephrin earlier, 5, 10, 12 minutes earlier, do you have a reasonable - - do you have an opinion with a reasonable degree of medical certainty as to whether that would have changed the outcome in this case?

    A.   I do

    Q.   And what's your opinion?

    A.   My opinion is that the sooner the Epinephrin was given after he received the drug, the more chance that he would have survived.

Although Dr. Harkrider stated that he believed that Mr. Taylor would have been resuscitated and recovered had the Epinephrin been administered at 5:00, he admits that no Epinephrin could have been administered by the responding nurse, Nurse Forrest, until a doctor arrived. Furthermore, in testifying as to whether Dr Houchin, the first doctor to the scene, was negligent in failing to timely respond to the code, Dr. Harkrider stated as follows:

    Q.   All right. Let's go back and talk about the situation that Dr. Houchin was in fact facing when he did arrive at 5:07 and how he handled the situation that he was faced with.
        First of all, let's be clear. You have no criticism of Dr. Houchin prior to his arrival at 5:07. He had no involvement with this patient?

    A. None.

(emphasis added).

-22-

Q. You're critical of the timing. You say it should have been given two minutes later than the first dose rather than three.

A. Right.

Q. Okay. And let's go on to the third dose.

. . . .

Q. Okay. So we're talking about the dosages of Epinephrin, and we're down to the third dose, I believe. What time would you have in your opinion - - should the third dosage of Epinephrin been given?

A. If the patient had no blood pressure or pulse or vital signs and we're still doing CPR?

Q. Right.

A. Because - - I would say two minutes later . . . .

Despite Dr. Harkrider's testimony that the doses of Epinephrin were not administered in a timely enough fashion and despite prior testimony in his discovery deposition indicating that Mr. Taylor would not have suffered brain damage had Epinephrin been properly administered, when questioned by Defendant's counsel about whether the alleged improper administration of Epinephrin caused the ultimate harm to Mr. Taylor, Dr. Harkrider testified as follows:

Q. (By Ms. Tuttle) With regard to your opinion pertaining to the timing of the Epinephrin, if each of those dosages had been moved up to where they were administered two minutes apart rather than three minutes apart, do you have an opinion based upon a reasonable degree of medical certainty whether that would have made a difference in the injury to Mr. Taylor and the outcome of this case?

A. I think in my deposition in the initial interrogatories I said that - - that the lack of administration of Epinephrin certainly impacted. I don't - - I don't think you can isolate the Epinephrin itself, giving the Epinephrin one minute sooner than before would have had him less of a brain injury. I think you'd have to view all of this - - all of the things that were going on at the time.

Q. Okay. So is your answer to that question no?

A. No.

After reviewing Dr. Harkrider's testimony, it appears to this Court that Dr. Harkrider failed to establish causation to a reasonable degree of medical certainty as required in *Kilpatrick*. Rather, Dr. Harkrider's opinions appear to set forth a "loss of chance" theory whereby the alleged negligent acts of the Defendant's employees "might have" or "possibly" resulted in Mr. Taylor not making as full a recovery. We found this particularly prevalent when the following testimony in Dr. Harkrider's deposition:

> Q. Okay. Do you have an opinion based upon a reasonable degree of medical certainty whether or not if Mr. Taylor had been intubated at 16:58 or 4:58 versus when he was intubated almost 14 minutes later at 5:12 p.m., whether or not that would have made a difference in the outcome of this case?
>
> A. I don't think any expert can say absolutely one way or the other. *The only way I can answer that question is that the sooner he was intubated, the sooner he got the Epinephrin, the greater his chance of resolving the issue and having a normal life*.

(emphasis added). As recognized by the Tennessee Supreme Court in *Kilpatrick*,

> we are persuaded that the loss of chance theory of recovery is fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link between the injury of a patient and the tortious conduct of a physician. As stated earlier, a plaintiff in Tennessee must prove that the physician's act or omission more likely than not was the cause in fact of the harm.

*Kilpatrick*, 868 S.W.2d at 602 (citing *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)). Furthermore, as previously noted, the court in *Kilpatrick* also held that "proof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient as a matter of law, to establish [proximate causation] in a medical malpractice case." *Id.* at 602. Since we find from the record that Dr. Harkrider did not establish causation to a reasonable degree of medical certainty, we hereby reverse the trial court's holding awarding judgment to Plaintiff.

### *Conclusion*

For the forgoing reasons, we affirm the trial court's holding regarding the competency of Dr. Harkrider to testify as an medical expert witness in this case, but reverse the trial court's finding that Dr. Harkrider established causation to a reasonable degree of medical certainty.

Accordingly, we reverse the trial court's award of damages against Defendant, Jackson-Madison County General Hospital District.  Costs of this appeal are taxed to Plaintiff, Kay Taylor Gneiwek as administrator of the estate of Jerry Alan Taylor, for which execution may issue if necessary.


 

_____

DAVID R. FARMER, JUDGE