# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 19, 2001 Session

## WILLIAM H. ROBERTS, M.D., ET AL. v. S. LANE BICKNELL, M.D., ET AL.

**A Direct Appeal from the Circuit Court for Madison County**
**No. C-96-141     The Honorable Roy B. Morgan, Judge**

---

### No. W2000-02514-COA-R3-CV - August 16, 2001

---

In this medical malpractice case, patient and wife sued physicians and their professional association for damages resulting from defendants' negligence, deviation from applicable standard of care, and lack of informed consent. The trial court granted defendants a partial summary judgment for all claims concerning incidents that occurred more than one year prior to the date suit was filed, as barred by the statute of limitations. Subsequently, the trial court granted summary judgment on the merits as to all remaining claims. Plaintiff appeals. We affirm.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which HOLLY KIRBY LILLARD, J. and JOHN FRANKLIN MURCHISON, SP.J., joined.

Oscar C. Carr, III, Memphis, For Appellant, Rosemary Roberts

Thomas H. Rainey, Marty R. Phillips; Jackson, For Appellees, S. Lane Bicknell, M.D., Harvey C. Harmon, M.D., Roy Appleton, M.D. and The Jackson Clinic Professional Association

### OPINION

Plaintiffs, William H. Roberts, M.D. and wife, Rosemary Roberts (hereinafter Plaintiff or Dr. Roberts)[1] sued Defendants, S. Lane Bicknell, M.D., Harvey C. Harmon, M.D., Roy Appleton, M.D., and the Jackson Clinic, Professional Association (hereinafter Dr. Bicknell, Dr. Harmon, Dr. Appleton, and the Clinic, respectively), for damages resulting from the Defendants' negligence in deviating from the applicable standard of care in their treatment of Dr. Roberts, and their failure to have Dr. Roberts's informed consent to perform certain procedures. Defendants' answer denied the

---

[1] Mrs. Roberts's suit is derivative for loss of consortium, companionship, and services. For ease of reference, we will refer to the Plaintiffs as Plaintiff or Dr. Roberts.

material allegations of the complaint concerning negligence and lack of informed consent and further specifically pleaded Plaintiff's action was barred by the applicable statute of limitations.

Dr. Roberts's claim has its origin in a procedure known as "cryoablation" for treatment of prostate cancer[2]. In December of 1994, Dr. Roberts,[3] an ophthalmologist, was diagnosed with prostate cancer. After the diagnosis, Dr. Bicknell recommended that Dr. Roberts consider cryosurgery as a treatment option. Dr. Bicknell explained that Dr. Roberts would be a good candidate for the procedure, and that the procedure would give Dr. Roberts a chance for a "relatively" normal life. When Dr. Roberts asked Dr. Bicknell what the disadvantages of the procedure were, Dr. Bicknell responded that, since the procedure was considered experimental, Dr. Roberts' insurance might not cover the cost. However, Dr. Bicknell indicated that he expected insurance providers would soon approve coverage for the procedure.

Following his diagnosis, Dr. Roberts decided to have his cancer treated by cryoablation. The record indicates that Dr. Roberts did little or no research on the efficacy of the cryoablation procedure, relying instead upon Dr. Bicknell's recommendation and informal conversations with other physicians with whom Dr. Roberts had contact. On December 27, 1994, Dr. Bicknell and his colleague, Dr. Appleton, performed the procedure on Dr. Roberts at The Jackson-Madison County General Hospital. On December 30, 1994, Dr. Roberts was discharged from the hospital.

The day after his hospital discharge, Dr. Roberts began to experience severe pain in his right thigh. Dr. Bicknell was not available that day, so Dr. Roberts spoke with another urologist at the Jackson Clinic, who prescribed some medication. On January 5, 1995, Dr. Roberts began to notice air coming out of his penis, and he called Dr. Bicknell and told him about his problem. He met Dr. Bicknell at the Clinic and, after some tests, Dr. Bicknell told him that there appeared to be some rectal damage. Dr. Bicknell re-admitted Dr. Roberts to the hospital on January 6, 1995, and referred him to a surgeon, Defendant, Dr. Harmon, for further tests. During the hospital stay and prior to an operation on January 9, 1995, he started passing feces through his penis and urine through his rectum.

At some point during Dr. Robert's second hospitalization, it became clear that he had developed a "urethrorectal fistula": a hole between his urethra and rectum. Dr. Harmon recommended a temporary colostomy to bypass the fistula and allow it to heal on its own. The record indicates that Drs. Bicknell and Appleton approved of this course of treatment and assured Dr. Roberts that the fistula would heal without surgery. Following the colostomy surgery, Dr. Roberts was re-admitted to the hospital in February of 1995, and again in June of 1995. Dr. Roberts also suffered numerous complications, including recurring urinary tract infections, yeast infections,

---

[2]"Cryoablation" of the prostate is a procedure in which a patient is placed under general anesthesia and a probe filled with liquid nitrogen is inserted into the patient's prostate to freeze and kill the prostate tissue.

[3]Dr. Roberts has died since filing this appeal, and his wife, Rosemary Roberts, has been substituted.

bleeding into the suprapubic tube and catheter which were left in his body following surgery, and a deep vein thrombosis in his left leg.

During his June hospital stay, Dr. Harmon advised Dr. Roberts that he believed the fistula had healed, and that the colostomy should be reversed. At that time, Dr. Roberts told Dr. Harmon that if the fistula had not healed, he "would prefer to have another physician deal with [his] medical problems because [he] had lost confidence in the urology department at The Jackson Clinic." In spite of this request, on June 23, 1995, Dr. Harmon attempted to repair the fistula and reversed the colostomy. Within two days of the operation, Dr. Roberts again noticed fecal material in his urine and urine coming through his rectum. Dr. Harmon was forced to perform an emergency colostomy on Dr. Roberts. At his family's insistence, Dr. Roberts was transferred to Vanderbilt University Hospital in Nashville, where Dr. Joseph Smith surgically repaired the urethrorectal fistula. Later, the second colostomy was reversed, Dr. Roberts had to have 14 ½ inches of his colon removed, and several hernias at the site of the colostomies repaired.

On April 22, 1996, Dr. Roberts and his wife filed this action for damages in Madison County Circuit Court, alleging negligence, failure to give or obtain informed consent, and deviation from the applicable standard of care against Drs. Bicknell, Appleton, Harmon, and The Jackson Clinic. On January 12, 1998, the trial court granted a Motion for Protective Order filed by non-party Jackson-Madison County General Hospital District which prevented Plaintiff from discovering certain documents deemed privileged information under T.C.A. § 63-6-219. Defendants filed a Motion for Partial Summary Judgment, alleging that the statute of limitations for medical malpractice, codified at T.C.A. § 29-26-116(a)(1), barred Plaintiff's claims occurring before April 22, 1995. The trial court granted the motion on July 14, 1998 and Plaintiff's motion to alter or amend the judgment was denied. This Court also denied Plaintiff's application for interlocutory appeal.

On September 15, 2000, the trial court entered an order granting Defendants' motion for summary judgment filed on February 29, 1997, but which was deferred pending Defendants' depositions. In the Order, the trial court found that Plaintiff's only expert witness, Dr. David Nigel Armstrong ("Dr. Armstrong"), was not competent to testify as to the applicable standard of care, and dismissed all Plaintiff's remaining claims.

Plaintiff has appealed and presents three issues for review: (1) Whether the trial court erred in finding the statute of limitations barred Plaintiff's claims occurring before April 22, 1995; (2) Whether the trial court erred in granting summary judgment to Dr. Harmon because of the trial court's disqualification of Plaintiff's expert, Dr. Armstrong; and (3) Whether the trial court erred in granting Jackson-Madison County General Hospital's Motion for a Protective Order barring discovery of documents from the Institutional Review Board.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of

demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 [now Rule 56.06] provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

Plaintiff's first issue is whether the trial court erred in granting summary judgment for all claims occurring prior to April 22, 1995. Dr. Roberts's suit was filed April 22, 1996, and his claims affected by the trial court's ruling include his action against Drs. Bicknell and Appleton based on lack of informed consent and negligence in rendering medical services. Both of these causes of action are subject to the one-year statute of limitations in T.C.A. § 29-26-116 (2000), which states in pertinent part:

> (a)(1) The statute of limitations in malpractice actions shall be one (1) year as set forth in § 28-3-104.
>
> (2) In the event the alleged injury is not discovered within such one (1) year period, the period of limitation shall be one (1) year from the date of such discovery.

Under T.C.A. § 29-26-116 (a)(2), the statute of limitations commences to run when the patient "discovered, or reasonably should have discovered (1) the occasion, the manner, and the means by which a breach of duty occurred that produced injuries and (2) the identity of the defendant who breached the duty." *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982); *see Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997). In *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn. 1998), the Court said:

The plaintiff may not, however, delay filing suit until all the injurious effects and consequences of the alleged wrong are actually known to the plaintiff. *Wyatt v. A-Best Company*, 910 S.W.2d 851, 855 (Tenn. 1995). Similarly, the statute of limitations is not tolled until the plaintiff actually knows the "specific type of legal claim he or she has," *Stanbury*, at 672, or that "the injury constitute[d] a breach of the appropriate legal standard," *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994). Rather, as we have recently emphasized, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant. *Stanbury*, at 677; *see also Roe*, 875 S.W.2d at 657 ("[T]he plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct."). "It is knowledge of facts sufficient to put a plaintiff on notice that an injury has been sustained which is crucial." *Stanbury*, at 678. Such knowledge includes not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury. *Hathaway v. Middle Tennessee Anesthesiology*, *P.C.*, 724 S.W.2d 355, 359 (Tenn. App. 1986).

*Id.* at 733-34.

Plaintiff asserts that the statute of limitations should only begin to run when Dr. Roberts became aware of the tortious origin of his injuries and notes Defendants' answer, in which Defendants admit that "Dr. Roberts was not informed that the fistula could be result of medical negligence . . . ." The record establishes that by January 9, 1995, Dr. Roberts not only noticed air coming out of his penis, but he noticed feces in his urine, was passing urine through his rectum, and was experiencing severe pain in his leg. He admits he knew something was wrong, and he knew that he had not been informed prior to the surgery that such conditions could or might occur. Dr. Roberts, an ophthalmologist by training, testified by deposition that he knew that a fistula was a "abnormal communication between two internal organs," although he noted that in his practice he did not deal with that particular type of fistula. Dr. Roberts also testified that:

I know a little bit about the basic principles of medicine; and when you have urine coming out of the rectum and feces coming out of the penis, you have to have a hole of some kind there.

Clearly, Dr. Roberts knew for a year before his suit was filed that when he gave his consent for the surgery, he had not been informed of anything approaching the complications that he encountered. By the same token, he was aware that there was an unusual and unexpected condition and, at the very least, was put on inquiry that some wrongful conduct had caused this condition.

Plaintiff argues that the statute of limitations should not begin to run until the Defendants' doctor-patient relationship with Dr. Roberts terminated, because Defendants continuously represented to Dr. Roberts that the fistula would heal by itself. Because of these continuing representations and assurances, Plaintiff asserts that Dr. Roberts could not have known of the tortious origin of his injuries until after the court-imposed date of discovery of April 22, 1995. We disagree.

First, this theory cannot apply to Dr. Robert's lack of informed consent claim. A lack of informed consent claim, by its very nature, arises when an individual becomes aware of the fact that his physicians did not disclose some risk or complication. *See Church v. Perales*, No. M19997-00227-COA-RS-CV, 2000 WL 1183074, at \*6 (Tenn. Ct. App. 2000). In this case, when Dr. Roberts discovered that he had a "hole of some kind," he had knowledge of a symptom or complication of which his physicians failed to adequately warn him. Therefore, continued assurances that the unexpected complication would "heal itself" are irrelevant to a determination of the date of discovery.

Secondly, we note that the Tennessee Supreme Court has expressly abrogated the "continuing medical treatment doctrine." *See Stanbury v. Bacardi*, 953 S.W.2d 671, 676 (Tenn. 1997). The continuing medical treatment doctrine was a presumption that a patient could not discover an injury while medical treatment continued. *See id.* The *Stanbury* court clearly stated the rule applicable to cases involving continuing medical treatment and assurances, "If there is actual proof that the patient *knows or reasonably should know of the injury or harm before termination of medical treatment*, the statute of limitations is not tolled." *Id.* We believe such proof exists in this case, and that there is no genuine dispute of the facts which establish the applicable discovery date. For these reasons, we affirm the trial court's grant of partial summary judgment to Defendants Bicknell and Appleton.

The second issue for review is whether the trial court erred in granting summary judgment to Drs. Bicknell, Appleton, and Harmon on the remaining claims. T.C.A. § 29-26-115 provides in pertinent part:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the claimant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Both Dr. Bicknell and Dr. Appleton filed affidavits and testified by depositions that they complied with the recognized standard of acceptable professional practice as urologists in Jackson, Tennessee. In addition, they presented similar proof from another physician. Plaintiff did not put on any expert proof concerning the standard of care required of Drs. Bicknell and Appleton or that they deviated from any standard of care which caused injury to Dr. Roberts. The trial court correctly granted summary judgment on the remaining claims against Drs. Bicknell and Appleton.

Plaintiff's cause of action against Dr. Harmon, as set out in his complaint, is as follows:

Plaintiffs allege that Harmon was negligent and deviated from the applicable standard of care in his care and treatment of Dr. Roberts both in general and for the following specific reasons, including, but not limited to:

A. In failing timely and appropriately to diagnose and treat the urethrorectal fistula;

B. In failing to refer Dr. Roberts to a physician competent to repair the urethrorectal fistula;

C. In concurring with or recommending to Bicknell and Appleton that the colostomy be reversed when Harmon knew or should have known the urethrotectal fistula had not healed;

D. In reversing the colostomy when the urethrorectal fistula was not healed to a sufficient degree to prevent the subsequent complications experienced by Dr. Roberts;

E. In failing generally to treat Dr. Roberts in accordance with the applicable standard of care.

The only expert witness offered by Plaintiff to prove the standard of care for surgeons in the Jackson community and Dr. Harmon's deviation therefrom was Dr. David Armstrong. The trial court determined that he was incompetent to testify, because he had no knowledge of the standard of care in Jackson or a similar community. Plaintiff has raised no specific issue concerning the trial court's ruling but has presented some argument disputing the ruling. As noted above, under Tennessee law, proof of failure of a physician to adhere to an acceptable standard of care in treating a patient must be by expert medical testimony. In the case at bar, the trial court found that Plaintiff's expert, Dr. David Armstrong, was not a qualified expert under the "locality rule," codified at T.C.A. § 29-26-115. We agree with the trial court that Dr. Armstrong, Plaintiff's only expert witness who has expertise in the area of treatment of urethrorectal fistula, does not conform to the requirements of T.C.A. § 29-26-115(a)(1).

The plaintiff in a medical malpractice action carries the burden of proof as to the statutory requirement that medical experts practice in a community similar to the one in which the claim arose. *See Mabon v. Jackson-Madison County General Hosp.*, 968 S.W.2d 826, 828 (Tenn. Ct. App. 1997). Although this Court has "admonished lawyers to couch their medical experts' conclusions in the language of" the statute, we realize that "a mere ritualistic incantation of statutory buzz evidences very little." *Church*, 2000 WL 1183074 at *13. Rather, we must look at the expert's opinion to determine if it is based upon "trustworthy facts or data sufficient to provide some basis for the opinion." *Id.* We must, therefore, examine the record for evidence that Dr. Armstrong was qualified to testify as to the recognized standard of acceptable professional practice required of a surgeon practicing in Jackson, Tennessee, or a similar community, in 1995.

Before examining the record, we note that the trial court is vested with broad discretion to determine the "admissibility, qualifications, relevancy and competency of expert testimony." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997). *See Shelby County v. Barden*, 527 S.W.2d 124, 131 (Tenn. 1975); *Mabon*, 968 S.W.2d at 829. The trial court's rulings in this regard will be upheld except upon a showing of an abuse of this discretion. *See McDaniel*, 955 S.W.2d. at 263-64. Although it is undisputed that Dr. Armstrong's affidavit recites the statutory buzz-words, "I am familiar with the standard of care in Jackson, Madison County, Tennessee. . . ," at deposition, Dr. Armstrong quite candidly admitted to knowing nothing about the practice of medicine in Jackson, Tennessee and the applicable standard of care for that locality. Dr. Armstrong's deposition includes the following exchange:

> Q (Defense counsel): And [sic] what fields of medicine do you consider yourself an expert?
> A (Dr. Armstrong): Colorectal surgery.
> Q: Have you ever been to Jackson, Tennessee?
> A: No, sir.
> Q: Do you know where it's located?
> A: No, sir.
> Q: Do you know the size of Jackson?
> A: No, sir.

Q:   Do you know how many hospitals there were in Jackson in 1995?
A:   How many hospitals?
Q:   Yes.
A:   No.
Q:   Do you know anyone that lives in Jackson, Tennessee?
A:   No.
Q:   Do you know of anyone who has ever practiced surgery in Jackson, Tennessee?
A:   No.
Q.   Are you familiar with the skills of any surgeons in Jackson, Tennessee?
A.   No, sir.
Q:   Have you ever treated a patient from Jackson, Tennessee?
A:   I don't believe so.
Q:   How many colleges or universities were in Jackson in 1995?
A:   I don't know, sir.
Q:   Were there any medical schools in Jackson in 1995?
A.   I don't know.  I've never been there.
Q.   Were there any teaching hospitals in Jackson in 1995?
A:   I don't know that.
Q:   How many medical specialties were represented in Jackson, Tennessee in June of 1995?
A:   I don't know.

Although we agree with Plaintiff's counsel that this Court is in "as good a position as the trial court . . . to determine this issue because the trial court considered only Dr. Armstrong's affidavit and deposition," we cannot say that the trial court abused its discretion in ruling Dr. Armstrong's testimony inadmissible.  The law on expert witnesses, as it exists in Tennessee, requires the expert to have <u>some</u> knowledge of the practice of medicine in the community at issue or a similar community.  We believe that it is reasonable to base such knowledge, among other things, upon information such as the size of the community, the existence or non-existence of teaching hospitals in the community and the location of the community.  Without such information, it is difficult to compare communities for the purpose of satisfying the locality rule.

In their brief, Plaintiff argues that:

> Dr. Armstrong's knowledge of the legal differences between a local standard of care versus a national standard of care are unimportant and irrelevant and do not affect the validity of his opinion with regard to whether Dr. Harmon rendered proper medical treatment to Dr. Roberts.

Plaintiff is, essentially, arguing that the locality rule be abandoned in favor of a national standard for medical care. However, this Court has settled this argument in a case in which we rejected an expert witness who premised his opinion on a national standard of care. *See Mabon*, 968 S.W.2d at 830. In that case, the expert witness's deposition testimony was nearly identical to that of Dr. Armstrong, reproduced above. *See id.* at 830-31.

Plaintiff's brief argues that a factual dispute is created by the testimony of Dr. Joseph Smith, one of Dr. Roberts's treating physicians, and also the testimony of one of the Defendants' expert witnesses, Dr. Guy Voeller. However, from the record it appears that Dr. Smith was not revealed by the Plaintiff as an expert witness against Dr. Harmon, and Dr. Smith's testimony shows that he did not know the recognized standard of acceptable professional practice for surgeons, such as Dr. Harmon, in the Jackson area. As to Dr. Voeller, he determined from the documented record that there would be no deviation from the standard of care on Dr. Harmon's part. Moreover, Dr. Voeller's deposition was taken pursuant to Tenn.R.Civ.P. 26.02 (4). Thus, his deposition may not be used at trial, except for impeachment purposes. *See* Tenn.R.Civ.P. 32.01 (1). The evidence supporting or opposing summary judgment must be such facts as would be admissible in evidence. *See* Tenn.R.Civ.P. 56.06.

Under the record in this case as to the cause of action against Dr. Harmon, there is no genuine issue as to any material fact, and Defendant, Dr. Harmon, was correctly granted summary judgment.

Since the Defendant, The Jackson Clinic, was sued only on the theory of *respondeat superior*, the trial court correctly granted summary judgment to The Jackson Clinic.

The third issue concerns the court's protective order regarding certain records of the Jackson Madison County General Hospital. The information sought from the hospital concerned the cryoablation procedure performed by Drs. Bicknell and Appleton on Dr. Roberts. Summary judgment was granted on this cause of action because it was barred by the statute of limitations. Therefore, the records sought under this issue have no relevance to the case and, therefore, we pretermit this issue.

In summary, the order of the trial court granting summary judgment to Defendants is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellant, Rosemary Roberts, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.