# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 15, 2010 Session

## MARKINA WESTMORELAND ET AL. v. WILLIAM L. BACON, M.D. ET AL.

### Appeal from the Circuit Court for Davidson County
#### No. 05C-3729    Joe Binkley, Judge

---

### No. M2009-02643-COA-R3-CV - Filed January 31, 2011

---

Plaintiffs appeal the summary dismissal of their medical malpractice claims against three physicians, an orthopedic surgeon, and two hematologists. In December 2004, Plaintiffs' mother, who suffered from several medical conditions, underwent a total hip replacement and remained in the hospital under the care of several doctors for ten days. Nine days after surgery, her condition dramatically declined; she died the following day from a severe diffuse pulmonary and gastrointestinal hemorrhage. Plaintiffs filed suit alleging the physicians breached the standard of care for their respective specialties in the care of their mother. Each defendant filed a motion for summary judgment and each motion was supported by the affidavit of the defendant as an expert witness. Plaintiffs submitted an affidavit of their expert witness in response. The trial court ruled that Plaintiffs' only expert was not a qualified witness under Tenn. Code Ann. § 29-26-115 and granted summary judgment to all three defendants. On appeal, Plaintiffs claim the trial court abused its discretion in finding that their expert witness was not qualified to testify. We affirm the trial court's ruling that Plaintiffs' expert was not qualified to testify under Tenn. Code Ann. § 29-26-115 and the summary dismissal of Plaintiffs' claims.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., joined.  RICHARD H. DINKINS, J., filed a dissenting opinion.

Bill M. Wade, Memphis, Tennessee, for the appellants, Markina Westmoreland, Jacqueline Westmoreland, and Robert Westmoreland, III.

Robert L. Trentham, Bryant C. Witt, and Sepideh C. Khansari, Nashville, Tennessee, for the appellee, William L. Bacon, M.D.

Michael A. Geracioti and Kelly R. Thomas, Nashville, Tennessee, for the appellee, Wichai Chinratanalab, M.D.

Thomas W. Lawrence, Jr., and Matthew A. Moushon, Nashville, Tennessee, for the appellee, Chukwuemeka Ikpeazu, M.D.

**OPINION**

This action arises from the death of Dorris Dennis in December 2004. Ms. Dennis was a fifty-two year old woman who suffered from a variety of medical conditions. In July 2003, Ms. Dennis began seeing a hematologist, Dr. Wichai Chinratanalab, who diagnosed her with pancytopenia,[1] which is a blood disorder, hepatitis C, and alcohol abuse, each of which put her at a higher risk of internal bleeding. In December 2004, after she complained of pain in her right hip, Dr. Chinratanalab referred Ms. Dennis to Dr. William Bacon, an orthopedic surgeon. Dr. Bacon saw Ms. Dennis on December 8, 2004, and observed evidence of avascular necrosis and osteoarthritis in her right hip. Dr. Bacon recommended that she either live with the pain or undergo hip replacement surgery. Ms. Dennis elected to have the surgery, which was scheduled for December 13, 2004.

Ms. Dennis was admitted to Nashville General Hospital on December 12, and due to her blood disorder, was given a transfusion of platelets. The surgery proceeded as scheduled on December 13, 2004 performed by Dr. Bacon with no complications. Following the surgery, Ms. Dennis remained in the hospital and her condition was monitored. The concern was that while Ms. Dennis's blood disorders made her prone to bleeding, in post-operative patients there is a concern of a patient developing blood clots. To prevent complications from blood clots, Dr. Bacon ordered Lovenox, an anti-coagulant; however, due to her blood disorders and her propensity for bleeding, Dr. Bacon ordered a lesser dose than usually prescribed during the post-operative period. She was also given Bextra for pain management.

Dr. Bacon continued to monitor Ms. Dennis over the next several days.[2] Dr. Bacon saw Ms. Dennis on December 14 and ordered additional red blood cells be given to Ms. Dennis; he did not order additional platelets on that day because her platelet count was within a normal range. Dr. Bacon saw Ms. Dennis again on December 15, and ordered an infusion of platelets. On December 16, Dr. Bacon ordered additional units of red blood cells.

---

[1]Pancytopenia is a condition characterized by a decrease in white, red, and other blood cells. *See* J.E. Schmidt, *Attorneys' Dictionary of Medicine* (Matthew Bender and Co. 2009).

[2]Also assisting in Ms. Dennis's care was Dr. Bacon's partner, Dr. Limbin, who was consulted by the nurses when he was the doctor on call from the office, and Dr. Bacon's physician assistant, Anthony Bernui.

Dr. Chinratanalab, who was not scheduled to treat Ms. Dennis post-surgery, was consulted on December 16 because Ms. Dennis had low potassium. On the same day, Dr. Chinratanalab examined Ms. Dennis, after which he ordered several tests and that she be given intravenous potassium. Dr. Chinratanalab's notes demonstrate that he wanted Ms. Dennis's platelet count to remain over 50,000 and her hematocrit level to remain over 50 percent. Dr. Chinratanalab was consulted again on December 17, at which time he ordered that Ms. Dennis receive additional red blood cells and that her dosage of Lovenox be lowered. On December 18, Dr. Chinratanalab ordered the discontinuation of Bextrat. Both her platelet count and hematocrit level were within the acceptable range on that day. On December 20, Dr. Chinratanalab suggested that a formal hematology consult be requested and that Lovenox be discontinued. Dr. Chinratanalab's last involvement with Ms. Dennis's care was on December 20, 2004.

Dr. Ikpeazu, a hematologist, performed the hematology consultation on December 20, following which he recommended an additional infusion of platelets and an alternative to Lovenox. This was Dr. Ikpeazu's only interaction with Ms. Dennis. Following Dr. Ikpeazu's consult, Dr. Bacon ordered Ms. Dennis be given an additional unit of platelets and Epogen.[3] On December 22, Dr. Bacon ordered two more units of platelets for Ms. Dennis.

In the late evening of December 22, Ms. Dennis's condition began to decline dramatically. She was placed in the intensive care unit. On the morning of December 23, 2004, Ms. Dennis died from internal bleeding, specifically from a severe diffuse pulmonary and gastrointestinal hemorrhage.

On December 7, 2005, the children of Ms. Dennis (hereinafter "Plaintiffs") filed this action asserting medical malpractice claims against several defendants including Dr. Bacon, Meharry Medical College, and Metro Hospital d/b/a Nashville General Hospital.[4] Plaintiffs voluntarily dismissed Nashville General Hospital from the action. On November 29, 2007, Plaintiffs filed an amended complaint asserting claims against two additional physicians, Dr. Chinratanalab and Dr. Ikpeazu.

In April 2009, Dr. Bacon, Dr. Chinratanalab, and Dr. Ikpeazu ("Defendants"), each filed a motion for summary judgment asserting that he had not breached the applicable standard of care. Each motion was supported by an affidavit of the defendant. For his part, Dr. Bacon stated that he had been certified by the American Board of Orthopedic Surgery since 1970, that he had practiced the specialty of orthopedic surgery in the Nashville area for

---

[3]Epogen is an anticoagulant. *Mosby's Medical Drug Reference* (Harcourt, Inc. 2002).

[4]Dr. Bacon's physician assistant was also sued but he was voluntarily dismissed before trial.

over thirty years, and that all of the medical care he provided to Ms. Dennis fully complied with the recognized standard of acceptable professional practice applicable to an orthopedic surgeon practicing in Nashville, Tennessee in 2004.

Dr. Chinratanalab testified that he completed a three-year residency in internal medicine,[5] a four-year fellowship in hematology/oncology at Vanderbilt University Medical Center, and that he is board certified in internal medicine, medical oncology, and hematology. He also testified that he is licensed and practices medicine in Nashville and is familiar with the recognized standard of care for the acceptable professional practice of medicine, specifically hematology, in the Nashville medical community in 2004, that he complied with the applicable standard at all relevant times, and no act of omission by him caused injury or death to Ms. Dennis.

In support of his motion for summary judgment, Dr. Ikpeazu stated that he has been licensed to practice medicine in the State of Tennessee since 1995, that he is board-certified in internal medicine and medical oncology, that he was the Chief of Hematology/Oncology at Nashville General Hospital at the time of Ms. Dennis's hospitalization in 2004, and that he is familiar with the recognized standard of acceptable professional practice for an oncologist/hematologist in the Nashville medical community in 2004. He also stated that at all times relevant to this action he complied with the recognized standard of acceptable professional practice required of a board-certified oncologist/hematologist in the Nashville community in the treatment of patients in Ms. Dennis's condition and that no act or omission on his part caused or contributed to her injuries or death.

In opposition to the three motions for summary judgment, Plaintiffs filed a response relying on one expert witness, Dr. Richard M. Sobel, an emergency room physician from Atlanta, Georgia, to demonstrate that each of the three defendants violated the applicable standard of care.[6] Defendants then filed responses asserting that Dr. Sobel's affidavit was inadmissible under Tenn. Code Ann. § 29-26-115(a)(1) because, *inter alia*, his specialty and experience as an emergency room physician did not make his expert testimony relevant to the issues in this case, and his affidavit failed to establish a threshold requirement of Tenn. Code Ann. § 29-26-115(a)(1), that he was competent or qualified under the Tennessee Medical Malpractice Act to testify concerning the specialties of orthopedic surgery and hematology as they pertain to the complex medical issues in this case.

---

[5]Dr. Chinratanalab completed two three-year residencies in internal medicine; one in Bangkok, Thailand; and one in internal medicine at Texas Tech University, Health Sciences Center in Lubbock, Texas.

[6]Specifics concerning Dr. Sobel's affidavit are set forth later in this opinion.

Following a hearing on the motions for summary judgment, the trial court entered an order on July 15, 2009 granting summary judgment to all three Defendants.[7] In its order, the trial court found that Defendants' affidavits were sufficient, pursuant to Tenn. R. Civ. P. 56.04 and 56.06, to shift the burden to Plaintiffs to demonstrate "competent responsive evidence in the record establishing there was a genuine issue of material fact." The trial court then found that Dr. Sobel's affidavit was insufficient to meet this burden because it did not demonstrate that Dr. Sobel was familiar with the recognized standards of acceptable professional practice applicable to Defendants' specialties of hematology and orthopedics; thus, he was not a qualified witness as required in Tenn. Code Ann. § 29-26-115(a)(1), (b). Because Plaintiffs had no other expert proof, the trial court found that Defendants were entitled to summary judgment.

Plaintiffs filed a Rule 59 motion to alter or amend supported by a supplemental affidavit of Dr. Sobel. The trial court denied the Rule 59 motion stating that Dr. Sobel's supplemental affidavit did not demonstrate that he was qualified to testify "given the complex nature of this particular medical treatment." Plaintiffs filed a timely appeal.

## ANALYSIS

The dispositive issue is whether the trial court erred in ruling that Plaintiffs failed to demonstrate that Dr. Sobel was a competent witness, as required by Tenn. Code Ann. § 29-26-115(a)(1), (b), to testify as a medical expert concerning the issues in the case.

A.
### MEDICAL EXPERT TESTIMONY

Pursuant to Tennessee's Medical Malpractice Act, Tenn. Code Ann. § 29-26-115, and the law of evidence generally, "the trial court exercises broad discretion to determine the qualifications of experts." *Cardwell v. Bechtol*, 724 S.W.2d 739, 754 (Tenn. 1987); *see also Kenyon v. Handal*, 122 S.W.3d 743, 759 (Tenn. Ct. App. 2003) (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)) (stating that "[d]ecisions regarding the qualifications or competency of an expert are entrusted to the trial court's discretion"). Accordingly, the admission or exclusion of evidence is within the trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)).

---

[7]The order also granted summary judgment to Meharry Medical College. The summary dismissal of the claim against Meharry Medical College is not at issue in this appeal.

On appeal, this court reviews the discretionary decisions of a trial court pursuant to the abuse of discretion standard. *Kenyon*, 122 S.W.3d at 759 (citing *Robinson v. LeCorps*, 83 S.W.3d 718, 725 (Tenn. 2002); *Seffernick*, 969 S.W.2d at 393; *Roberts v. Bicknell*, 73 S.W.3d 106, 113 (Tenn. Ct. App. 2001)). A trial court abuses its discretion when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

An appellate court will only set aside a discretionary decision when it appears "the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *White*, 21 S.W.3d at 222 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)). Therefore, we review a trial court's discretionary decision to determine:

> (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives.

*Id.* at 223 (citing *BIF v. Service Constr. Co.*, 1988 WL 72409, at *3 (Tenn. Ct. App. 1988)). If reasonable judicial minds can differ concerning its soundness, this court shall permit the trial court's discretionary decision to stand. *Id.* (citing *Overstreet* 4 S.W.3d at 709).

## B.
### THE TENNESSEE MEDICAL MALPRACTICE ACT

The Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-115(a) requires a plaintiff asserting a claim for medical malpractice to establish:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

-6-

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a)(1)-(3).

In order to establish the elements listed above, a plaintiff must present competent expert evidence. *McDaniel v. Rustom*, No. W2008-00674-COA-R3-CV, 2009 WL 1211335, at *5 (Tenn. Ct. App. May 5, 2009) (citing *Hessmer v. Miranda*, 138 S.W.3d 241, 244 (Tenn. Ct. App. 2003)). The statute sets forth the following criteria for whether a witness is qualified to testify:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

Tenn. Code Ann. § 29-26-115(b).

It is undisputed that Dr. Sobel was licensed to practice medicine in Georgia during the year preceding the alleged injury or wrongful acts at issue and that Georgia is a state that borders Tennessee. Thus, to resolve the dispositive issue as to whether the trial court erred in excluding Dr. Sobel's affidavits, we must determine whether his medical training or his experience as an emergency room specialist make his testimony "relevant to the issue in this case" as required by Tenn. Code Ann. § 29-26-115(b).

Tenn. Code Ann. § 29-26-115(b) does not require that an expert witness practice the same specialty as the defendant; nevertheless, the expert witness "must be sufficiently familiar with the standard of care of the profession or specialty and be able to give relevant testimony on the issue in question." *Cardwell,* 724 S.W.2d at 754. Therefore, "where an expert has a sufficient basis on which to establish familiarity with the defendant's field of practice, the expert's testimony may be accepted as competent proof even though he or she specializes or practices in another field." *McDaniel*, 2009 WL 1211335, at *8 (citing *Coyle v. Prieto*, 822 S.W.2d 596, 600 (Tenn. Ct. App. 1991); *Ledford v. Moskowitz*, 742 S.W.2d 645, 647-48 (Tenn. Ct. App. 1987); *Stokes v. Leung*, 651 S.W.2d 704, 706 (Tenn. Ct. App. 1982)). This is generally referred to as the fungibility of experts, which is recognized and permitted under Tennessee's Medical Malpractice Act. Although fungibility of experts is

allowed, "*where an expert is unfamiliar with the practice of another field and with its standard of care . . . ,*" it would be inconsistent "with the terms or the policy of the Medical Malpractice Act to permit . . . generalized evidence." *Id.* *9 (citing *Cardwell*, 724 S.W.2d at 754-55) (emphasis in original).

Our courts have repeatedly rejected efforts to adopt a general standard of care to which medical doctors could testify, holding it is both contrary to the express provisions of Tenn. Code Ann. § 29-26-115(b) and a significant departure from the case law of this State. *Cardwell*, 724 S.W.2d at 754. As stated in *Cardwell*, Tenn. Code Ann. § 29-26-115(b) "was enacted in part to prevent further erosion of the competency requirements for expert witnesses in malpractice actions" and that it would be inconsistent with the Medical Malpractice Act to permit "generalized" evidence to establish a standard of care in a locality. *Id.* at 754-55.

Therefore, we must examine the affidavits of Dr. Sobel to determine if he is sufficiently familiar with the respective standards of care for the practices of hematology and orthopedic surgery in the locality of Nashville, Tennessee to be competent to opine as to whether one or more of Defendants deviated from the applicable standard of care.

C.
PLAINTIFFS' EXPERT WITNESS – DR. SOBEL

Plaintiffs presented two affidavits of Dr. Sobel to establish that he was qualified and competent to provide expert testimony concerning the issues in this case. The first affidavit was in opposition to Defendants' motions for summary judgment. The second affidavit was filed in support of Plaintiffs' Rule 59 motion to alter or amend the order summarily dismissing Plaintiffs' claims.

The First Affidavit of Dr. Sobel

In Plaintiffs' first attempt to establish that Dr. Sobel was qualified or competent to testify, as Tenn. Code Ann. § 29-26-115 requires, they presented the affidavit of Dr. Sobel which reads in pertinent part:

> 2. I was licensed and practicing medicine in the State of Georgia in the field of emergency medicine a year prior to the medical and nursing care and treatment rendered to Doris Dennis by employees or agents of Nashville General Hospital ("NGH") in Nashville, Tennessee as set forth below. A correct and current copy of my *Curriculum Vitae* is attached as Exhibit A and incorporated by reference herein.

-8-

3. Through training, education, experience, years of retrospective expert and peer review and familiarity with community standards, I know the standard(s) of care to be provided by physicians in a community similar to Nashville, Tennessee in treating patients with conditions similar to those experienced by Doris Dennis as set forth in the medical records which I have received. Furthermore, I have extensive experience in the care of patients with the diagnoses of hypotension (low blood pressure) and hemorrhage.

4. I am familiar with the medical community in Nashville, Tennessee, and the surrounding communities. From my personal knowledge and review of statistical information, I am aware that Nashville is a large metropolitan area with a total population of over 1,500,000. Both Vanderbilt University School of Medicine and Meharry Medical College are located in Nashville, Tennessee. There are approximately sixteen (16) hospitals in the area, including at least three (3) large hospital chains – HCA, Baptist and St. Thomas.

In paragraph 5 of his first affidavit, Dr. Sobel stated that Nashville General Hospital is a licensed hospital facility, which is accredited by the Joint Commission on Accreditation of Healthcare Organizations, it is located near downtown Nashville, it offers inpatient and outpatient care, it has approximately 125 beds, 24-hour emergency room care, and it provides many other services including specialized surgical services, such as orthopedic surgery, in addition to post-surgical and other services.

In paragraph 6 he stated that Nashville General Hospital "is similar to hospitals where he practices medicine" and that "the Greater Atlanta and Greater Nashville metropolitan areas are similar communities."

In paragraphs 7, 8, and 9, he stated that he had reviewed substantial records and based his opinions on the records identified in his affidavit, and he stated that in his opinion the three defendants, Drs. Chinratanalab, Bacon and Ikpeazu, "acted below the applicable standard of care and medical practice when treating Ms. Dennis in December 2004, including but not limited to their collective failure to adequately monitor, evaluate and/or treat her health conditions during the recovery from hip replacement surgery." In the following paragraphs, Dr. Sobel stated:

10. The records of the above referenced admission indicate that Ms. Dennis had evidence of abnormally low blood pressure and/or hypotension consistent with shock on December 22, 2004. Additionally, she was found to have evidence of a deteriorating medical condition on that date.

11. I do not find evidence of acceptable evaluation and management of Ms. Dennis' condition on December 22, 2004 by her treating physician(s).

12. Prior to her final deterioration on the 22nd, the medical records document a significant and substantial drop in hemoglobin and hematocrit of Ms. Dennis several occasions during this hospitalization.

13. Ms. Dennis was at increased risk of hemorrhage (bleeding) due to her medical conditions and medication she received during this hospitalization.

14. A reasonable and prudent physician would appreciate, that when a patient such as Ms. Dennis has an unexpected drop hemoglobin/hematocrit the possibility of hemorrhage (bleeding) must be duly considered and medically worked up. Thus, the occurrence of acute and then recurring anemia (drop in hemoglobin/hematocrit) in a patient the same or similar to Ms. Dennis must trigger a diligent search for the presence of hemorrhage and the detection of a source of bleeding by the responsible physician(s) and/or their consultants. This was not provided to Ms. Dennis. Furthermore, I do not find evidence of simple and expected routine monitoring for gastrointestinal hemorrhage that would be customary for Ms. Dennis. Thus, although hemorrhage was the medically likely cause of the recurrent anemia experienced by Ms. Dennis, efforts to monitor, evaluate, diagnose, prevent or adequately treat it by her physician(s) did not occur.

15. This inadequate monitoring, evaluation, prevention, diagnosis and treatment of blood loss anemia in a patient the same or similar to Ms. Dennis during her post-surgical hospitalization in December 2004 was a breach of the applicable standards of reasonable medical practice.

16. Ms. Dennis was a patient with known Hepatitis C, a history of alcohol abuse, evidence of a coagulopathy (disorder of clotting) and thrombocytopenia. She had a hip replacement. She was placed on Lovenox (an anti-coagulant). These are all factors that would predictably increase Ms. Dennis' risk of bleeding. Therefore, a reasonable and prudent physician(s) would not prescribe Bextra (valdecoxib) nor continue it if it had been prescribed. Bextra belongs to a class of medicines known to carry the risk of gastrointestinal bleeding and impair platelet function. It was known to all of Ms. Dennis' physicians that she had severe thrombocytopenia (low platelets) and further risks for bleeding. The prescription of Bextra to Ms. Dennis was negligent and below the applicable standards of care; it was clearly

contraindicated. Bextra was not timely discontinued. This, in my opinion, was a substantial contributory cause of her demise.

17. The autopsy confirms the presence of hemorrhage as the cause of Ms. Dennis' death.

18. Ms. Dennis' hip replacement was a high risk elective procedure. Informed consent specifically explaining the increased risks of the procedure and the post operative period should have been thoroughly explained to her. I do not know if this occurred, even though a consent form was signed. Further discovery would be required to complete an opinion.

19. Ms. Dennis' post operative period required intensive monitoring and diligent medical management with respect to the risk of bleeding. Non-essential medications that would increase her risk of bleeding were contraindicated. Adequate maintenance and close monitoring of her platelet counts were required. Evidence for the occurrence of hemorrhage should have been actively pursued. Optimum prophylactic medication for prevention of gastrointestinal bleeding (proton inhibitor medication) should have been administered. Recurrent drops in hemoglobin and hematocrit should have been adequately evaluated and treated. Continued anti-coagulation on December 20, 2004 should not have been recommended. These and the above detailed actions or inactions of the responsible physician(s) represent breaches of the acceptable standards of medical practice.

20. Had the treating physicians complied with the applicable standards of acceptable medical practice, more likely than not, and to a reasonable degree of medical certainty, Ms. Dennis would not have died as a consequence of hemorrhage and shock December 23, 2004.

In the final paragraph, he stated that he reserved the right to "modify his opinions on the basis of further records and/or testimony I receive."

After the first affidavit was filed in opposition to Defendants' motions for summary judgment, Defendants challenged Dr. Sobel's qualifications and competency to testify concerning the standards of care at issue. Following a hearing, the trial court concluded that Dr. Sobel's affidavit was insufficient to establish his competency to testify as an expert witness concerning the issues at bar because he failed to demonstrate that he was familiar with the standards of acceptable professional practice applicable to hematology and orthopedics in the Nashville medical community. Therefore, the court ruled that Dr. Sobel

was not a qualified witness as required in Tenn. Code Ann. § 29-26-115(a)(1), (b). With the exclusion of Plaintiffs' only expert witness, the facts asserted in Defendants' motions for summary judgment were uncontroverted and, accordingly, the trial court summarily dismissed Plaintiffs' claims against all three defendants.

Plaintiffs then filed a Tenn. R. Civ. P. 59 motion to alter or amend the court's rulings, which motion was supported by the supplemental affidavit of Dr. Sobel. Thus, we now turn our attention to that affidavit.

<u>The Supplemental Affidavit of Dr. Sobel</u>

In his supplemental affidavit, which is also lengthy, Dr. Sobel states, *inter alia*, that he is familiar with "the standard of care applicable to physicians prescribing Lovenox after the procedures that were performed or omitted" in this action. He states that he is "familiar with the recognized standard of acceptable professional practice for physicians prescribing Lovenox in Nashville, Tennessee." He further states that he is an emergency room physician, that he had not received any training in hematology, but he began his training in internal medicine just as a hematologist would and that "[a] hematologist, an internist and an emergency physician are all expected to understand the basic physiology of the blood components." As for the field of orthopedic medicine, Dr. Sobel states that he has "considerable training, clinical and teaching experience in orthopedics." As an emergency physician, he explains, he is "called upon to evaluate, diagnose and provide the initial management and stabilization of a wide variety of orthopedic problems" and that he consults with orthopedic physicians to discuss his patients with orthopedic problems. Further, he states that he was "aware of the level of knowledge ordinarily possessed by orthopedic physicians with respect to these classes of medications, that is, anti-inflammatory agents and anti-coagulants."

The trial court found that the supplemental affidavit of Dr. Sobel was insufficient to establish that Dr. Sobel was qualified to testify regarding "the recognized standard of acceptable professional practice of the orthopedic surgeon, Dr. Bacon, and the two hematologists, Drs. Chinratanalab and Ikpeazu." The trial court further found that the supplemental affidavit of Dr. Sobel was insufficient because it provides "no new or additional information showing him to be sufficiently familiar with the specialities of Orthopaedic Surgery and/or Hematology in order to comply with the requirements of T.C.A. § 29-26-115(a) and (b)."

Having reviewed Dr. Sobel's affidavits several times, and acknowledging that his affidavits are thorough in many respects, we are unable to conclude that the trial court abused its discretion in finding that the affidavits were insufficient to satisfy the threshold

-12-

requirement that Dr. Sobel was sufficiently familiar with the standard of care relevant to the issues in this case. The affidavits establish that he is familiar with a general standard of care concerning the benefits, risks and general uses for Lovenox; however, familiarity with a general standard of care is not sufficient.

Throughout Dr. Sobel's supplemental affidavit in the section titled "The Standard of Care for Hematologists," Dr. Sobel refers to what can only be described as a general standard of care. For example, he states the following:

> Any hematologist, general internist, family practice physician, general medical physician or emergency physician is expected to have certain requisite knowledge to care for patients that they assume the general conditions that they choose to treat. Treating Ms. Dennis with Lovenox required general medical knowledge of the drug prescribed, its potential adverse effects and basic physiology of blood components, such as the platelet and red blood cell. A higher level of proficiency in hematology was not required.

As we stated above, a physician's understanding of a "general standard of care" is insufficient for purposes of the Medical Malpractice Act. *See Cardwell*, 724 S.W.2d at 754.

Dr. Sobel's limited experience and knowledge of the standard of care applicable to orthopedic surgery or hematology as it pertains to Ms. Dennis's complex medical condition, as distinguished from a general standard of care relative to the administration of Lovenox, becomes more apparent when we focus on what Dr. Sobel does not state in his affidavits. A close examination of Dr. Sobel's affidavits reveals the absence of fellowship training or experience in hematology and orthopedic surgery; his training in these areas is limited to the basic education afforded to all medical students. It reveals that he has not performed hip replacement surgery. Moreover, it reveals that he has not been responsible for the continuing care of a post-surgical hospital patient with complex blood disorders such as pancytopenia or thrombocytopenia, liver disease due to Hepatitis C, and avascular necrosis, all of which Ms. Dennis had.

The above facts, specifically the lack of training or professional experience pertinent to the patient's circumstance at issue in a medical malpractice action, are similar to those in the case of *McDaniel v. Rustom*, 2009 WL 1211335. In that matter, the plaintiffs proffered the testimony of a doctor who was board certified in internal medicine to rebut the affidavit of a pediatrician practicing in the field of pediatric emergency medicine. When the defendant challenged the qualifications of plaintiffs' expert witness as they pertained to the medical issues in that case, the trial court found the plaintiffs' expert was not competent to testify in that case because the expert did not state that he was "familiar with the acceptable standard

of professional practice of physicians practicing in the emergency department . . . for patients with allergic reactions to antibiotics and symptoms such as those presented by [the decedent]." *Id*. at *12. On appeal this court agreed, holding that the plaintiffs' expert witness was not competent to testify because he failed to establish that he was familiar with the standard of care of emergency room physicians and stating:

> [W]e find no basis for his claimed familiarity with the applicable standard of care for physicians practicing in an emergency room. Although Dr. Marks claimed that the standard of care for treating [the decedent's] "nonemergent" symptoms was "universal" for "all specialists," including emergency room physicians, he failed to demonstrate any basis for knowing the standard of care of emergency room physicians. As the Court explained in *Carmichael*, 2000 WL 124843, at *3-4, *the fact that an expert witness states that he or she is familiar with the applicable standard of care does not, ipso facto, render the testimony admissible*. Dr. Marks' testimony was similar to that offered and excluded in *Goodman*, 803 S.W.2d at 698, and *Brown*, 1998 WL 34190563, at *5, regarding "the standard of care for medical practice in general." In *Cardwell*, 724 S.W.2d at 754-55, the Court rejected the notion that an expert from any medical profession can testify "regarding matters of common observation and experience" and concluded that "where an expert is unfamiliar with the practice of another field and with its standard of care," it would be inconsistent with the terms and policy of the Medical Malpractice Act to permit such generalized evidence.

*Id*. at *12 (emphasis added).

As we noted previously, although the Medical Malpractice Act, specifically Tenn. Code Ann. § 29-26-115(b), "contains no requirement that the witness practice the same specialty as the defendant," a medical expert witness "must be sufficiently familiar with the standard of care of the profession or specialty and be competent or qualified under the Act to give relevant testimony on the standards of care in question." *Cardwell*, 724 S.W.2d at 754 (citing *Searle*, 713 S.W.2d at 65). Therefore, if a proffered expert witness, such as Dr. Sobel, cannot satisfy this threshold requirement, then the proffered expert may not opine as to whether any of the defendant physicians deviated from the applicable standards of care at issue. *See Id*.

Furthermore, this court reviews a trial court's evidentiary decisions under the abuse of discretion standard, which requires us to determine if the court applied an incorrect legal standard or reached a decision that is against logic or reasoning. *Eldridge*, 42 S.W.3d at 85; *Cardwell*, 724 S.W.2d at 754. Pursuant to the abuse of discretion standard, we are not to

substitute our judgment for that of the trial court and a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge*, 42 S.W.3d at 85.

Having considered the facts stated in Dr. Sobel's first affidavit and his supplemental affidavit, it is apparent that Dr. Sobel is an accomplished and respected emergency room physician who has a general understanding of the standard of care of several specialties, including hematology and orthopedic medicine. This is due to the wide variety of cases – injuries, conditions and illnesses – presented in an emergency room setting. However, it is also apparent that Dr. Sobel has failed to establish that he has the requisite education, training or experience to be sufficiently familiar with the standards of care for the professions or specialties of hematology and orthopedic surgery to give relevant testimony concerning Ms. Dennis' hip replacement surgery and the appropriate post-surgical care for a patient like Ms. Dennis with complex medical conditions including pancytopenia, thrombocytopenia, liver disease, avascular necrosis, and related bleeding problems.

Accordingly, we find the trial court did not abuse its discretion in finding that Plaintiffs failed to establish that Dr. Sobel was a qualified witness as required in Tenn. Code Ann. § 29-26-115(a)(1), (b).

C.
SUMMARY JUDGMENT

We have determined the trial court did not err in finding that Dr. Sobel was not competent to testify under Tenn. Code Ann. § 29-26-115. As Plaintiffs failed to submit any other evidence to demonstrate a genuine issue of material fact, summary judgment was appropriate. Tenn. R. Civ. P. 56.04; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003) (stating summary judgment is appropriate when a party establishes that there is no genuine issue as to any material fact). Accordingly, the trial court appropriately granted summary judgment.

IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Appellants.

_____
FRANK G. CLEMENT, JR., JUDGE

-15-